IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM RANDALL COX, M.D., | : | |
| | : | Case No. 1:14-cv-00814 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING DEFENDANTS' |
| BLUE ASH OHIO POLICE OFFICER | : | MOTION FOR SUMMARY |
| ROGER POHLMAN, *et al.*, | : | JUDGMENT |
| | : | |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment. (Doc. 76.) Plaintiff William Randall Cox, M.D. alleges in this civil rights action that two police officers from the Blue Ash, Ohio Police Department, Defendants Sergeant Roger Pohlman and Officer Todd Stewart, used excessive force to effectuate his arrest. Dr. Cox was unaware that an arrest warrant had been issued and was hosting a birthday party for his terminally-ill teenage son when Sergeant Pohlman and Officer Stewart arrived at his home to arrest him. Sergeant Pohlman tased Dr. Cox seven times in the presence of his family members and close friends. For the reasons that follow, Defendants' Motion will be **DENIED**.

## I.     BACKGROUND

### A.     Facts

On December 2, 2012, non-party Gretchen Myers filed a protection order violation report with the Blue Ash Police Department against Dr. Cox. (Doc. 64-1 at 975–77.)[1] Dr. Cox previously was involved in a romantic relationship with Myers, but she had secured a temporary

---

[1] All page numbers in citations to documents filed electronically in the CM/ECF system refer to the PageID numbers.

protection order against him earlier in 2012 after their relationship ended.  (Cox Dep., Doc. 54 at 302–04, 321.)  Blue Ash Police Officer Jun Cho completed the report.  (Doc. 64-1 at 976.) Myers claimed that several days before, on November 27, 2012, Dr. Cox pulled in behind her at a Shell gas station.  (*Id.*)  She alleged that Dr. Cox stared at her when she paid for a car wash and blocked the exit from the car wash with his vehicle.  (*Id.* at 976–77.)  Officer Cho stated in his report that Dr. Cox violated "section 5 of the protection [order] when he failed to immediately leave Shell."  (*Id.* at 976.)  An arrest warrant was issued that day for Dr. Cox for violation of a protection order pursuant to Ohio Revised Code § 2919.27.  (Doc. 2-3 at 55.)

Sergeant Pohlman was the reviewing supervisor.  (Pohlman Dep., Doc. 64 at 876.)  He made the decision to have an arrest warrant executed the same day the report was filed.  (*Id.* at 883.)  Sergeant Pohlman asked Officer Todd Stewart to help him serve the warrant.  (*Id.* at 884.) Because the warrant would be served in Evendale, Ohio, he asked for an Evendale police officer to assist as well.  (*Id.*)  Officer Rick Vonderhaar responded.  (*Id.*)

The officers arrived at Dr. Cox's house at approximately 8:30 p.m.  (Doc. 64-2 at 978; Stewart Dep., Doc. 68 at 1112.)  It was dark outside, but the front porch and landscape lights were on.  (Cox Dep., Doc. 54 at 366; D. Boyle Dep., Doc. 73 at 1335; Waller Dep., Doc. 75 at 1455.)  A surprise birthday party for Dr. Cox's terminally-ill son, William Cox, was underway at the Cox home.[2]  (Cox Dep., Doc. 54 at 324.)  Family members, neighbors, and William Cox's Princeton High School classmates and teammates attended the party.  (*Id.* at 326.)  Alcohol was not consumed at the party.  (*Id.* at 468; Mason Cox Dep., Doc. 58 at 660.)  Sergeant Pohlman

---

[2] Dr. Cox's son died on July 2, 2013 from a rare brain tumor known as DIPG.  (Cox Dep., Doc. 54 at 289.)

knew Dr. Cox was a doctor, and he described the Cox's neighborhood as "[m]iddle, upper class." (Pohlman Dep., Doc. 64 at 900, 902.)

It is undisputed that, in effectuating the arrest, Sergeant Pohlman tased Dr. Cox seven times. (Pohlman Dep., Doc. 64 at 938–40.) A taser can be used in two ways. In dart mode, the taser shoots out two projectile darts up to twenty-five feet and is intended to cause neuromuscular incapacitation. (*Id.* at 874; Stewart Dep., Doc. 68 at 1130.) In drive stun mode, no darts are deployed, but rather the taser is placed against the skin creating localized pain intended to cause compliance. (Pohlman Dep., Doc. 64 at 874–75.) Witness accounts of the moments before and during the taser deployments vary.

### 1. Officers' Testimony[3]

Officer Stewart rang the doorbell, which was answered promptly by a female later identified as Joi Cox, Dr. Cox's adult daughter. (J. Cox Dep., Doc. 56 at 557; Pohlman Dep., Doc. 64 at 889.) Officer Stewart asked for Dr. Cox, who then came to the door. (Pohlman Dep., Doc. 64 at 890–91.) Officer Stewart asked Dr. Cox to step outside so their conversation "would be in private." (*Id.* at 892.) Dr. Cox complied by stepping outside, and partially shutting the front door behind him. (*Id.*; Vonderhaar Dep., Doc. 72 at 1276.) Officer Stewart explained to Dr. Cox that they were there because he had violated the protection order at the gas station. (Pohlman Dep., Doc. 64 at 893; Stewart Dep., Doc. 68 at 1116–18.) Dr. Cox acknowledged that he knew about the protection order, but said he was not at the gas station. (Pohlman Dep., Doc. 64 at 893, 895–96.) Officer Stewart then told Dr. Cox he had a warrant for his arrest, at which point Dr. Cox "made a quick move towards the house, turned around, and pushed the door that

---

[3] Officer Stewart was deposed the same day as Sgt. Pohlman and his deposition was much shorter. He was asked as the deposition began if he remembered anything different about the incident than Sgt. Pohlman had testified to and he responded that he did not. (Stewart Dep., Doc. 68 at 1110.)

was ajar open and proceeded to try to go in the house." (*Id.* at 896.) Officer Stewart described Dr. Cox's movement as a "pivot[]" and then "an athletic, lunging move towards the front door." (Stewart Dep., Doc. 68 at 1119.) Sergeant Pohlman recalls Dr. Cox saying something like, "I have to go inside." (Pohlman Dep., Doc. 64 at 896.) Officer Vonderhaar testified that Dr. Cox first responded to the arrest warrant by stating that he wanted to call his attorney, Carl Lewis. (Vonderhaar Dep., Doc. 72 at 1279–80.)

The officers prevented Dr. Cox from going inside the house. (Pohlman Dep., Doc. 64 at 902; Stewart Dep., Doc. 68 at 1121.) Sergeant Pohlman stated Dr. Cox had one foot up on the stoop inside the doorway, and the officers began struggling with him. (Pohlman Dep., Doc. 64 at 902.) Sergeant Pohlman grabbed Dr. Cox's right hand, while Officer Stewart grabbed Dr. Cox's left arm. (*Id.* at 897, 902; Stewart Dep., Doc. 68 at 1121.) However, Officer Vonderhaar testified that Dr. Cox walked back through the front door into the entry of his house and that the officers had to step inside to bring him out. (Vonderhaar Dep., Doc. 72 at 1281.)

### a.    First Taser Use

Sergeant Pohlman testified that as the struggle began, the officers tried to handcuff Dr. Cox and repeatedly yelled, "Put your arms behind your back, you're under arrest, stop resisting." (Pohlman Dep., Doc. 64 at 910; Stewart Dep., Doc. 68 at 1131.) They told Dr. Cox that he could not return to the house. (Pohlman Dep., Doc. 64 at 907.) Dr. Cox tensed up. (Pohlman Dep., Doc. 64 at 910.) Officer Vonderhaar described Dr. Cox's actions as "random motions, not giving up his arms." (Vonderhaar Dep., Doc. 72 at 1287.) Officer Stewart stated that Dr. Cox "continually press[ed] forward" and did not offer "any compliance whatsoever." (Stewart Dep., Doc. 68 at 1122.) He agreed that Dr. Cox did not swing or kick at the officers, but merely tried to break free from the officers' grip. (*Id.* at1124.)

4

While repeatedly giving these commands, Sergeant Pohlman got his taser out and told Dr. Cox that, if he did not comply with the officers' orders, he would be tased. (Pohlman Dep., Doc. 64 at 911; Vonderhaar Dep., Doc. 72 at 1298.) Officer Stewart tried joint manipulations, but Sergeant Pohlman could tell they were not working. (Pohlman Dep., Doc. 64 at 911; Stewart Dep., Doc. 68 at 1127–28.)[4] Sergeant Pohlman testified that Dr. Cox "lung[ed] toward the door." (Pohlman Dep., Doc. 64 at 911.) Officer Stewart gave the instruction to tase Dr. Cox. (*Id.*; Stewart Dep., Doc. 68 at 1130.) Sergeant Pohlman told Dr. Cox he would be tased if he did not comply with orders, and pointed the taser at Dr. Cox and shot him with it, deploying darts into his upper back. (Pohlman Dep., Doc. 64 at 911, 916.) Sergeant Pohlman held the taser in his right hand while holding Dr. Cox's right arm with his left hand. (*Id.* at 917.) Sergeant Pohlman estimates that the officers struggled with Dr. Cox for "at least a minute" before tasing Dr. Cox for the first time. (*Id.* at 912.) The first taser's shock lasted seven seconds. (*Id.* at 921.) Officer Vonderhaar heard the taser pop and assumed from the loud noise that the taser had not made good contact. (Vonderhaar Dep., Doc. 72 at 1294–95.) The taser appeared to have no effect on Dr. Cox. (Stewart Dep., Doc. 68 at 1133.) Defendants' expert witness opined that neuromuscular incapacitation did not occur due to the limited probe spread that occurs in taser deployments of less than seven feet. (Ijames Report, Doc. 76-1 at PageID 1554.) The officers did not attempt to take Dr. Cox to the ground before tasing him for the first time. (Pohlman Dep., Doc. 64 at 913–14.)

---

[4] Sgt. Pohlman described joint manipulations as a pain compliance technique, not a movement of a person's arms to handcuff him. (Pohlman Dep., Doc. 64 at 912.) However, Officer Stewart said that he was not attempting pain compliance, but to gain control of Dr. Cox mechanically. (Stewart Dep., Doc. 68 at 1129.)

###### b.    Second Taser Use

After the first taser deployment, Sergeant Pohlman continued to try to restrain Dr. Cox and get his arms behind his back to handcuff him.  (*Id.* at 911–12.)  He had the taser in his right hand, and it was not activated.  (*Id.* at 921.)  Dr. Cox continued to lunge towards the house.  (*Id.* at 921.)  Sergeant Pohlman stated that the officers struggled with Dr. Cox, told him several times very loudly to stop resisting arrest, and told him that he would be tased again if he did not comply.  (*Id.* at 921–22.)  After struggling for thirty seconds more, Sergeant Pohlman then tased Dr. Cox for the second time with the same cartridge.  (*Id.*)  The second taser shock lasted five seconds.  (*Id.* at 923.)  Both the first and second tasers took place on the front porch area.  (*Id.* at 922.)

###### c.    Third Taser Use

Sergeant Pohlman and Officer Stewart were not able to handcuff Dr. Cox after the second tasing.  (*Id.* at 923.)  Again, they ordered Dr. Cox to put his hands behind his back and to stop resisting.  (*Id.*)  Sergeant Pohlman testified that Dr. Cox still was trying to get inside his house at this time.  Officer Stewart then employed a takedown to get Dr. Cox off the front stoop and onto the ground.  (*Id.*; Stewart Dep., Doc. 68 at 1133–34.)

After the takedown, Dr. Cox was "laying face down, kind of leaning towards the right a little bit" partially into a mulch area and partially in the grassy area of the front yard.  (Pohlman Dep., Doc. 64 at 923–24.)  Officer Stewart testified that his weight was not on Dr. Cox, but on his knees, which were on the ground.  (Stewart Dep., Doc. 68 at 1135.)  Likewise, Officer Vonderhaar testified that Officer Stewart was straddling or kneeling over Dr. Cox around his belt line.  (Vonderhaar Dep., Doc. 72 at 1290–92.)  Dr. Cox's left arm was out to his side, and his right arm was straight down and tucked under his side such that Sergeant Pohlman could not see

it.  (Pohlman Dep., Doc. 64 at 924.)  His head was closest to the door at a forty-five degree angle.  (*Id.*)  Shortly after taking Dr. Cox to the ground, Officer Stewart handcuffed Dr. Cox's left wrist.  (*Id.* at 927; Stewart Dep., Doc. 68 at 1136.)  Officer Stewart remembers Dr. Cox saying that he could not breathe.  (Stewart Dep., Doc. 68 at 1139.)

Officer Vonderhaar did not see how Dr. Cox ended up on the ground.  (Vonderhaar Dep. Doc. 72 at 1288.)  He had started to do crowd control at that point, using himself as a block so that people coming out of the house did not get involved in the struggle.  (*Id.* at 1289.)  Officer Vonderhaar testified that ultimately eight to ten people came out of the Cox house to witness the arrest.  (*Id.* at 1301.)  He did not see any bystanders grab at the officers or Dr. Cox.  (*Id.* at 1302.)

Sergeant Pohlman assisted Officer Stewart in trying to keep Dr. Cox on the ground, but he could feel Dr. Cox trying to rise up.  (Pohlman Dep., Doc. 64 at 928, 931.)  Sergeant Pohlman was on Dr. Cox's right side giving him commands to put his arm behind his back and stop resisting arrest.  (*Id.* at 929.)  Dr. Cox did not give Sergeant Pohlman his right hand to be handcuffed.  (*Id.* at 930.)  Sergeant Pohlman testified that Dr. Cox's arm was "stiff and rigid, and he was obviously and blatantly trying to disregard my order of giving me his hand. . . .  He was using force to keep his arm down."  (*Id.* at 932.)

Sergeant Pohlman claims that while Dr. Cox's arm was under his right side, he was "concerned that [Dr. Cox] possibly could have a weapon under – inside.  He had loose clothing on."  (*Id.* at 934.)  Officer Pohlman stated that the officers had not had time to pat Dr. Cox down for a weapon.  (*Id.* at 935.)  At this point, there were about ten people standing outside around the officers and they were yelling loudly that Dr. Cox had done nothing wrong.  Dr. Cox yelled to call Judge Nadine Allen, his neighbor and a judge on the Hamilton County, Ohio Common Pleas Court, and Carl Lewis, his attorney, and said he did not do anything wrong.  (*Id.* at 934;

Cox Dep., Doc. 54 at 444–45.)  Officer Vonderhaar tried to keep control of the crowd at this

point.  (Pohlman Dep., Doc. 64 at 935.)  Sergeant Pohlman then deployed his taser for the third

time for a full five-second duration.  (*Id.* at 936.)  The third tasing seemed to have no effect.  (*Id.*

at 941.)

### d.    Fourth Taser Use

After the third taser deployment, Dr. Cox repeatedly stated that he could not breathe,

asked for Judge Allen and Carl Lewis to be called, and said he did not do anything wrong.  (*Id.* at

936–37, 941; Stewart Dep., Doc. 68 at 1140.)  Sergeant Pohlman gave him commands to stop

resisting and put arms behind his back.  Officer Stewart moved his position to get some weight

off Dr. Cox's chest, "even though it seemed to [Sergeant Pohlman] like Dr. Cox was breathing

just fine."  (Pohlman Dep., Doc. 64 at 936.)  Sergeant Pohlman stated that the officers gave Dr.

Cox a warning that he would be tased again, and then tased him for a fourth time, because Dr.

Cox still did not comply with their commands.  (*Id.* at 942.)  Officer Stewart described Dr. Cox

as "tensed up the entire time with his arm directly under his chest/waistband area."  (Stewart

Dep., Doc. 68 at 1141.)  Twelve seconds elapsed between the third and fourth tasings.  (Pohlman

Dep., Doc. 64 at 942.)  The tasing lasted five seconds.  (*Id.* at 942.)

### e.    Fifth and Sixth Taser Use

The officers decided to move Dr. Cox to a sitting position after the fourth tasing because

they still could not handcuff his right arm.  (*Id.* at 943.)  They first asked him to sit up himself

stating that he would be able to breathe better.  (*Id.*)  Dr. Cox did not comply, so they sat him up.

(*Id.*)  Defendants testified that Dr. Cox did not allow himself to be handcuffed, but he tried to

stand up to get to the door.  (*Id.* at 945–47; Stewart Dep., Doc. 68 at 1142.)

Officer Pohlman deployed the taser at Dr. Cox a fifth time, but the taser created no electrical charge because one of the probes had come out of Dr. Cox. (Pohlman Dep., Doc. 64 at 944.) Sergeant Pohlman immediately turned the taser off and replaced the cartridge in the taser. (*Id.* at 944–45.) He then deployed the taser a sixth time, again for five seconds. (*Id.* at 946–47.)

### f. Seventh Taser Use

Dr. Cox again was lying on the ground face down after the fifth and sixth tasings. (*Id.* at 948.) Sergeant Pohlman stated that Dr. Cox still had his right arm stiff at his side and that the officers could not get him handcuffed. (*Id.*) Officer Vonderhaar joined in the effort to handcuff Dr. Cox at this time. (*Id.* at 949.) Dr. Cox was warned he would be tased again if he did not comply. (*Id.*) Sergeant Pohlman tased Dr. Cox a seventh time, this time in drive stun mode to the upper body, and then the officers handcuffed him. (*Id.*; Vonderhaar Dep., Doc. 72 at 1295–97.) According to the record of deployments created by the taser, three minutes and twenty-eight seconds elapsed between the first and the seventh tasings. (Doc. 64-4 at 982.) Dr. Cox said that he could not breathe after he was handcuffed. (Stewart Dep., Doc. 68 at 1147.) The officers called a life squad for Dr. Cox. (Pohlman Dep., Doc. 64 at 949.)

### 2. Plaintiffs' Witnesses' Testimony

Dr. Cox was unaware that an arrest warrant had been issued for him before the officers arrived at his house to arrest him during the surprise party for his terminally ill son. (Cox Dep., Doc. 54 at 330–31.) Dr. Cox described Officer Stewart's demeanor as "nasty and rude." (*Id.* at 332.) He stepped outside of his house and onto the porch at the officers' request. (*Id.* at 333.) He testified that he had "just turned" to face his daughter and tell her to call his attorney and Judge Allen, when he "got jumped from the back." (*Id.* at 336, 341.) He said that somebody "grabbed [him] and threw [him] backwards." (*Id.* at 336.) He does not recall when he fell to the

ground nor does he remember what happened between the time someone first grabbed him and when he fell to the ground.  (*Id.* at 340, 344.)  He remembers only that he ended up lying on the ground with someone on top of him and his "right arm [ ] buried up underneath [him]" and then being tased.  (*Id.* at 340.)  He testified that he could not move his body or his right arm "because somebody was on [his] neck and somebody was on [his] back."  (*Id.* at 342, 344.)  He stated that "[w]hen I was on the ground I couldn't move."  (*Id.* at 457.)  He understood that an officer had his left arm.  (*Id.* at 347.)  He described being tased as "severe pain that hit [his] body" and he remembers screaming.  (*Id.* at 344, 345.)  He does not remember the officer giving him orders or commands after he was taken to the ground.  (*Id.* at 347–48.)

Dr. Cox testified that he could not breathe after he was taken to the ground and tased. (*Id.* at 349.)  He remembers the officers tried to stand him up, but that he was unable to.  (*Id.*) He remembers being in a seated position.  (*Id.* at 353.)  When asked if he was short of breath because he had been struggling with the police, Dr. Cox responded that he did not know why he was short of breath, but he denied he struggled with the police.  (*Id.* at 349.)  He denied that he had resisted arrest.  (*Id.* at 352.)[5]  He does not recall trying to go back towards the front door of his home after the incident with the officers began.  (*Id.* at 360.)  He remembers yelling out that he could not breathe and asking someone to call his attorney or Judge Allen.  (*Id.* at 353.)  He does not remember at what point the officers were able to secure both of his hands in handcuffs. (*Id.* at 359.)  Dr. Cox does not specifically remember seeing the taser pointed at him or deployed. He does not know which officer tased him or how many times he was tased.  (*Id.* at 364–65.)  He knows only that he was tased when he was lying on his stomach.  (*Id.* at 371.)

---

[5] Cox admitted that he has panic attacks.  (Cox Dep., Doc. 54 at 349.)  He testified that he has agoraphobia, or fear of open spaces, that bothers him when he is driving on the freeway.  (*Id.* at 350–51.)  He testified that he does not think he was having a panic attack during the incident with the police in his front yard.  (*Id.* at 352.)

Other party guests testified in a similar manner to Dr. Cox. Guests stated that Dr. Cox stepped outside to talk to the officers. (D. Boyle Dep., Doc. 73 at 1338–40.) At some point, he turned to Joi Cox to ask her to call his attorney. (*Id.* at 1342; Waller Dep., Doc. 75 at 1424.) Jonathan Boyle, William Cox's friend, testified that he thought Dr. Cox re-opened the front door to ask that someone call his attorney. (J. Boyle, Doc. 52 at 216, 225.) Sade Waller, Joi Cox's friend, testified that Joi Cox opened the door. (Waller Dep., Doc. 75 at 1424.)

Joi Cox denied that her father tried to head back into the house after the officers told him they had a warrant for his arrest. (J. Cox Dep., Doc. 56 at 566–67, 573.) Waller denied that Dr. Cox took any steps toward the house. (Waller Dep., Doc. 75 at 1425.) Rather, Joi Cox stated that he merely "pivot[ed]" towards her and asked her to call his attorney. (J. Cox Dep., Doc. 56 at 566–67, 573.) The guests stated that an officer put an arm around Cox's neck, pulled him off the porch, and took him down to a lying position with his stomach and face on the ground. (*Id.* at 574; D. Boyle Dep., Doc. 73 at 1343–45; J. Boyle, Doc. 52 at 227; Waller Dep., Doc. 75 at 1426, 1432; Watts Dep., Doc. 70 at 1187–88.)

Tina Mason Cox, Dr. Cox's former wife from whom he was divorced at the time of the incident, testified that she heard the commotion, went to the door, and was stepping outside immediately after the officer wrapped his arm around Dr. Cox. (Mason Cox Dep., Doc. 58 at 668.) Dr. Cox grabbed hold of her arm before he was removed from the porch. (*Id.* at 670.) An officer pulled Dr. Cox's arm from Tina Mason Cox. (*Id.* at 671–72.) Dr. Cox asked his former wife to call his attorney saying his phone number was in his car. (*Id.* at 671.)

Sharon Watts, a family friend, testified that Joi Cox was outside asking the officers what was happening when her father was grabbed by the officers and pulled towards the yard. (Watts Dep., Doc. 70 at 1186.) She also testified that she saw and heard the officers tase Dr. Cox two

times before he was taken to the ground. (*Id.* at 1191, 1196.) She heard the officers tell Dr. Cox when he was still standing to stop resisting. (*Id.* at 1197.)

Joi Cox said that after her father was taken to the ground, an officer knelt on her father's back, held his wrists, and yelled at him to stand up. (J. Cox Dep., Doc. 56 at 575, 588.) Other guests testified that the officer who took Dr. Cox to the ground had his knee in Dr. Cox's back. (D. Boyle Dep., Doc. 73 at 1353; Ferguson Dep., Doc. 62 at 802; Waller Dep., Doc. 75 at 1446; Watts Dep., Doc. 70 at 1196; Mason Cox Dep., Doc. 58 at 706.) Joi Cox "scream[ed]" at the officer "how can he stand up and you're on his back." (J. Cox Dep., Doc. 56 at 575, 584.) Likewise, Danielle Boyle testified that she heard the officers tell Dr. Cox to stand up, but she did not hear them say to stop resisting or put his arms behind his back. (D. Boyle Dep., Doc. 73 at 1361.) Marc Ferguson said the officers were telling Dr. Cox to shut up. (Ferguson Dep., Doc. 62 at 802, 810.) Danielle Boyle testified that his "arms were already behind his back" and that Dr. Cox "was not resisting." (D. Boyle Dep., Doc. 73 at 1361–62.) Likewise, Sade Waller testified that while Dr. Cox was on the ground, he was not fighting the officers' attempts to handcuff him and was not trying to pull his right arm away. (Waller Dep., Doc. 75 at 1441–42, 1471.) Sharon Watts testified that the officer with the taser "continuously" tased Dr. Cox "after he was subdued, after he was on the ground with the two on his back." (Watts Dep., Doc. 70 at 1190, 1205.) Tina Mason Cox also stated that Dr. Cox was tased when the officers were on top of him. (Mason Cox Dep., Doc. 58 at 682.)

Joi Cox could not identify which officer tased her father which time, but she testified that he was tased six or seven times total both while he was on the ground and after the officers pulled him up. (J. Cox Dep., Doc. 56 at 589, 591–92, 597.) Danielle Boyle testified that the officers were "very aggressive" and that they "[t]ased [Dr. Cox] frequently." (D. Boyle Dep.,

Doc. 73 at 1352, 1356.) She saw sparks from the taser, and she saw Dr. Cox shake or be jolted when he was tased. (*Id.* at 1359–60, 1563.) Sade Waller also described the officer who dragged Dr. Cox off the porch as "aggressive" and "rude" during the incident. (Waller Dep., Doc. 75 at 1463.) She only saw Dr. Cox tased after he was on the ground. (*Id.* at 1440, 1473.) She did not hear the officers give Dr. Cox any warnings or commands before he was tased. (*Id.* at 1474, 1498.) Other guests also testified that Dr. Cox trembled or shook when he was tased. (Eddins Dep., Doc. 60 at 746; Ferguson Dep., Doc. 62 at 824.) Witnesses recall Dr. Cox repeatedly said that he could not breathe when he was on the ground. (J. Cox Dep., Doc. 56 at 580; D. Boyle Dep., Doc. 73 at 1347; J. Boyle, Doc. 52 at 235; Eddins Dep., Doc. 60 at 755; Waller Dep., Doc. 75 at 1446, 1471; Mason Cox, Doc. 58 at 704.) Jonathan Boyle stated that Dr. Cox began to gasp for air after being tased on the ground. (J. Boyle, Doc. 52 at 233, 235.) Danielle Boyle took the video recordings of the incident on her cell phone. (D. Boyle Dep., Doc. 73 at 1357–58.) Dr. Cox can be heard saying repeatedly "I can't breathe, I can't breathe," but it is unclear from the dark images what was happening as he made the statements. (Doc. 77.)

Tina Mason Cox said the events happened in a chaotic fashion, but she denied that there was "a crowd control issue because no one was really out of line except the police officers." (Mason Cox, Doc. 58 at 685, 696.)

### 3. Events After the Tasings

Dr. Cox, in handcuffs, was transported to University Hospital by ambulance. (Cox Dep., Doc. 54 at 370–71, 374.) He complained about chest pain, a swollen left arm, and abrasions on his lower chest and abdomen area. (*Id.* at 373–74.) He was diagnosed with having suffered acute renal failure and a myocardial infarction. (*Id.* at 376.) Dr. Cox's kidney later returned to normal functioning. (*Id.* at 385.)

In the criminal case against Dr. Cox that followed, Dr. Cox submitted a Notice of Alibi that he was at a Verizon store and then a restaurant at the time Gretchen Myers had asserted that he was violating the protection order. (Doc. 2-4 at 56–57.) A surveillance video at a Verizon store proved the alibi for Dr. Cox. (Pohlman Dep., Doc. 64 at 961–62.) The criminal charge against Dr. Cox was dismissed on January 30, 2013. *State of Ohio v. Cox*, No. C/12/CRB/36939 (Hamilton Cty., Ohio). Dr. Cox has sued Gretchen Myers in a separate lawsuit filed in state court for making the complaint that gave rise to the arrest warrant issued on December 2, 2012. (Cox Dep., Doc. 54 at 298–300.)

## B.    Procedural History

On October 17, 2014, Dr. Cox initiated this civil suit by filing a Complaint against six police officers from Blue Ash and Evendale who participated in or arrived at the scene during or after the incident, including Sergeant Pohlman and Officer Stewart. He then filed an Amended Complaint that same day. (Doc. 2.) Subsequently, Dr. Cox dismissed his claims against Officers Schueler, Vonderhaar, Lantry, and McCormick. Relevant to the pending motion, Dr. Cox pleaded the following claims against Sergeant Pohlman and Officer Stewart:

> Count I:  Excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983;

> Count III:  Battery under state law;

> Count IV:  Intentional infliction of emotional distress under state law.

(*Id.* at 44–51.)

Sergeant Pohlman and Officer Stewart filed a Motion for Summary Judgment as to all claims pled against them on August 22, 2016. (Doc. 76.) Dr. Cox opposed the motion as to

Counts I and III, but he withdrew his state common law claim for intentional infliction of emotional distress. (Doc. 81 at 1667.) This matter is ripe for consideration.[6]

## II.      STANDARDS OF LAW FOR SUMMARY JUDGMENT MOTIONS

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."

---

[6] This civil action initially was assigned to the Honorable Sandra S. Beckwith, Senior Judge for the Southern District of Ohio. Judge Beckwith transferred it to the Clerk for reassignment on October 4, 2016 in anticipation of her impending retirement. (Docs. 83, 86.)

*Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cn\ty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.    ANALYSIS

### A.    Fourth Amendment Claim

Dr. Cox asserts a claim against Sergeant Pohlman and Officer Stewart for excessive use of force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983.  Section 1983 creates a cause of action to remedy constitutional violations as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

The test for a Fourth Amendment excessive force claim is whether the officers' conduct was "objectively reasonable." *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 137 (6th Cir. 2014) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  To determine what force was reasonable, a court must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tenn. v. Garner*, 471 U.S. 1, 8 (1985)).  The test of reasonableness is a fact-specific inquiry that "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the

16

suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *see also Harmon v. Hamilton Cty.*, 675 F. App'x 532, 540 (6th Cir. 2017) (quoting same). The officers' subjective intent or motivation is not relevant and their actions must not be judged with the "20/20 vision of hindsight." *Harmon*, 675 F. App'x at 540 (quoting *Graham*, 490 U.S. at 396).

Defendants each assert that they are entitled to qualified immunity on the Fourth Amendment claim. The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity provides immunity from suit, not simply a defense to liability. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether qualified immunity applies, a court must ask whether the government official's conduct violated a constitutional right, and if yes, ask whether the specific right violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). A court can examine either issue first. *Pearson*, 555 U.S. at 236. "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.* at 232. A defendant is entitled to qualified immunity if his conduct violated a constitutional right, but that right was not clearly established at the time of the violation. *Saucier*, 533 U.S. at 200–01. It is the plaintiff's burden to prove that immunity should not attach after a defendant raises a qualified immunity defense. *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011).

The inquiry into whether the constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition."

17

*Saucier*, 533 U.S. at 201. Courts look "first to the decisions of the Supreme Court, and then to the case law of this circuit in determining whether the right claimed was clearly established when the action complained of occurred." *Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012) (citation omitted). Case law must "dictate [or] truly compel" the conclusion; it is not enough for case law to "suggest or allow or raise a question about" the conclusion. *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002) (citation omitted). Nonetheless, "there need not be a case with the exact same fact pattern, or even fundamentally similar or materially similar facts; rather, the question is whether the defendants had fair warning that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (internal quotations and citations omitted).

Generally, the court must examine the conduct of each individual defendant separately when determining whether each defendant violated the Fourth Amendment and whether each defendant nonetheless is entitled to qualified immunity. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Here, however, the evidence indicates that Defendants acted in concert with one another. For example, Sergeant Pohlman deployed the taser for the first time only after Officer Stewart told him to do so. After Dr. Cox had been taken to the ground, Officer Stewart kneeled on or over him while holding his left arm while Sergeant Pohlman tried to secure his right arm and deployed the taser. A reasonable jury could find under these facts that if excessive force was used against Dr. Cox, both Defendants engaged in excessive force.[7]

---

[7] Alternatively, even when officers do not act in concert, an officer who does not actively engage in the use of excessive force can be held liable under the Fourth Amendment, if the officers "both (1) observed or had reason to know that excessive force would be or was being used, and (2) ... had both the opportunity and the means to prevent the harm from occurring." *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (internal citation omitted); *see also Williams v. Collins*, No. 15-CV-337, 2017 WL 1196114, at *5 (S.D. Ohio Mar. 31, 2017) (similar standard). Certainly, as explained in the textual analysis, there are sufficient facts for a jury to find that Officer

Applying the first factor of the *Graham* test for the use of excessive force, the crime at issue is a misdemeanor. The Court does not dismiss the serious nature of the violation of a civil protection order, but it is worth noting that there was no allegation in this case by Gretchen Myers that Dr. Cox had brandished a weapon or physically threatened her. (Docs. 2-1, 2-2.) Other circumstances also are relevant to the potential dangerousness of the situation facing the officers. Sergeant Pohlman admitted that he knew Dr. Cox was a physician and he described Dr. Cox's neighborhood as middle- or upper-class. Finally, although the police attempted the arrest during a birthday party, this was a party for a terminally-ill teenager. There is no evidence that the crowd was boisterous or unruly when the officers arrived. No alcohol had been served at the party. A reasonable jury could find that the officers had little objective reason to expect resistance or a dangerous situation when they attempted to arrest Dr. Cox.

As to the second and third *Graham* factors, Defendants' evidence paints a picture where the use of a taser was not excessive because Dr. Cox was attempting to evade arrest. The Sixth Circuit stated in 2012 that "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012). Similarly, Defendants rely on International Association of Chiefs of Police's National Policy Center's guidance on the use of tasers which states that tasers can be used (1) where grounds for arrest are present and (2) a reasonable officer believes physical force will be used to "resist the arrest and detention." (IJames Report, Doc. 76-1 at 1552.) "Active resistance includes physically struggling with, threatening, or disobeying officers. And it includes refusing to move your hands for the police to

---

Stewart, who participated in the effort to arrest Dr. Cox but did not deploy a taser, violated the Fourth Amendment under this alternative theory if the tasings constituted unreasonable force.

handcuff you, at least if that inaction is coupled with other acts of defiance." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (internal quotations and citations omitted).

Based on Defendants' evidence, Dr. Cox acted in a defiant manner or resisted arrest by trying to flee from the officers and back into his house; by struggling with the officers, including being non-responsive to joint manipulation maneuvers, tensing his body; and by holding his right arm beneath his body so that the officers could not handcuff him. Defendants also note that they were unable to establish that Dr. Cox did not have a weapon before the physical struggle began. Finally, they assert that the officers had particular reason to fear for their safety in light of the presence of party guests who witnessed and protested against Dr. Cox's arrest.

Defendants' version of the facts, though, is disputed in material respect by Dr. Cox and his witnesses. Under his version of the facts, he was not actively resisting arrest. To begin, Dr. Cox denied that he was trying to flee the officers to evade arrest. He explicitly denied that he physically struggled with the officers. He and his witnesses dispute that he attempted to re-enter his house. Rather, multiple witnesses stated that he merely turned or pivoted to tell his daughter, who was at or near the front door, to call his attorney and his neighbor, Judge Allen. The right of criminal defendants to representation by an attorney is enshrined in the Constitution. The Court will not equate a request to speak to an attorney in and of itself as an attempt to resist arrest.

Moreover, the failure to immediately comply with commands does not constitute active resistance. *See Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015). The Sixth Ciruit has explained this principle from *Goodwin* as follows:

> In *Goodwin,* officers initially responded to a noise complaint from a loud party in claimant David Lee Nall's apartment in 2010. Sometime after the officers gave Nall a warning, a guest leaving the party told them that Nall was "crazy" and had threatened to kill the guests and the police. *Id.* at 319. Intending to arrest Nall for disorderly conduct, the officers returned to his apartment and asked him to step

outside. Nall refused, told them he did not have to step outside, and closed the door. *Id.* The officers then kicked the door open and tased Nall in dart mode for an unusually long period of twenty-one seconds, then again in drive stun mode. The court held that the officers had used excessive force in the first tasing, since "Mr. Nall's single statement that he would not leave his apartment, or the fact that he remained in his apartment rather than exiting, does not in itself render [the officer's] use of the Taser reasonable." *Id.* at 324. Nall's "passive refusal" to comply with the officers' commands was "more akin to the suspect's refusal to exit his car in *Eldridge* than to the continued resistance and hostility present in the active resistance cases." *Id.* at 325–26 .

*Kent v. Oakland Cty.*, 810 F.3d 384, 393 (6th Cir. 2016). Applied here, if Dr. Cox's version of the facts is true and he merely asked for his attorney to be called, that passive refusal to immediately comply would not justify the initial use of force when the officers tased him on the front porch.

Dr. Cox also disputes that he resisted arrest after he was taken to the ground. Joi Cox believed that her father could not stand up and submit because the officers were on his back forcing him to remain on the ground. Although the officers state that Officer Stewart was straddling Dr. Cox, multiple party guests testified in their depositions that his knee was on Dr. Cox's back. Dr. Cox testified that he could not move and that his arm was trapped beneath him. Danielle Boyle testified that Dr. Cox was not resisting and that his arms were behind his back. Sharon Watts testified that Dr. Cox was tased after he was subdued on the ground with the officers on top of him. "[T]he use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Rowlery v. Genesee Cnty.*, No. 12-CV-15292, 2015 WL 2090712, at *6 (E.D. Mich. May 5, 2015) (quoting *Baker v. City of Hamilton,* 471 F.3d 601, 607 (6th Cir. 2006)), *appeal dismissed*, 614 F. App'x 471 (6th Cir. 2016).

Also, contrary to the officers' testimony that the tasing had no effect, even when Dr. Cox was on the ground, Dr. Cox described being in severe pain from the tasings. He repeatedly

stated that he could not breathe. The party guests also described Dr. Cox as trembling and shaking with each tasing. A reasonable jury could conclude based on his witnesses' testimony that he did not refuse to release his right arm to Sergeant Pohlman to be handcuffed, but rather that he was physically unable to cooperate. As the Sixth Circuit recently stated in a tasing case with a similar dispute about whether a suspect was resisting handcuffing, "[w]hether [a suspect or arrestee] was refusing to relinquish his right arm or whether he was unable to do so is material to determining whether the [tasing] use of force employed by [the law enforcement officer] was excessive." *Harmon*, 675 F. App'x at 541. "[A] factual dispute as to whether Defendants' actions precluded [the plaintiff] from complying with any orders" can preclude a holding that Defendants' use of a taser was not excessive as a matter of law. *Id.* at 542.

Finally, Defendants cite to *Sheffey v. City of Covington*, 564 F. App'x 783 (6th Cir. 2014), as a favorable, comparable case, but the Court finds the facts in *Sheffey* to be distinguishable in material respect. In that case, the Sixth Circuit held that police officers were entitled to qualified immunity despite the fact that they tased Leroy Hughes in drive-stun mode eight times over a period of forty-seven seconds, and twelve times overall, resulting in his death. *Id.* at 785–88. Hughes was being investigated for a misdemeanor charge of carrying a concealed firearm without a permit. *Id.* at 790. He was an "objectively large man" weighing 410 pounds who was behaving suspiciously in an area near two elementary schools where children were present. *Id.* He continually reached for his waistband, reached into his pocket, at one point threw a box of ammunition at one officer, repeated the word "dynamite," and tried to flee. *Id.* at 785, 791. He demonstrated no physical reactions to the repeated tasings and the officers believed his heavy clothing might have impeded the taser's effectiveness. *Id.* at 786–87. Conversely, here, Dr. Cox was arrested at his own home in a middle- or upper-class

neighborhood in the presence of his terminally-ill teenage son and numerous other family members and friends. There is no indication in the record that he was a physically large man or that he ever threw any objects at the officers. The evidence is disputed as to whether he attempted to flee. Additionally, although the officers testified that he did not appear to react to the tasings—at least not to the point of releasing his right arm to be handcuffed— Dr. Cox's witnesses described him as shaking or trembling as he was tased.

In sum, factual disputes preclude a holding that Defendants are entitled qualified immunity. If the factfinder credits the testimony of Dr. Cox and his witnesses, the factfinder can conclude that Dr. Cox was not a threat to himself or others and was not actively resisting arrest. First, they could conclude that Dr. Cox did not try to flee back into his house when he turned to ask his daughter to call his attorney. Second, the factfinder could conclude that Dr. Cox was precluded from complying with the officers' commands to submit to handcuffing by the officers' use of force against him. The tasings would constitute excessive force in these circumstances. "[T]he gratuitous or excessive use of a taser would violate a clearly established constitutional right." *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008); *see also Rudlaff*, 791 F.3d at 642 (stating that officers cannot use a taser if the suspect does not resist arrest or has stopped resisting arrest). Thus, the Court will deny summary judgment to Sergeant Pohlman and Officer Stewart on the Fourth Amendment claim.

**B.      Battery**

Dr. Cox also asserts a claim against Defendants for common law battery. Battery is "an intentional uninvited contact with another." *Harris v. U.S.*, 422 F.3d 322, 330 (6th Cir. 2005). Nonetheless, police officers are privileged to make reasonable physical conduct in effectuating an arrest. *Id.* at 331; *Snyder v. U.S.*, 990 F. Supp. 2d 818, 832 (S.D. Ohio 2014). State law

23

provides qualified immunity for an officer acting within the scope of his employment so long as the officer was not acting with "malicious purpose, in bad faith, or in a wanton and reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b); *see also Hale v. Vance*, 267 F. Supp. 3d 725, 736 (S.D. Ohio 2003) (explaining the statute). The parties agree that at the summary judgment stage a plaintiff's state law battery claim ordinarily rises and falls with the Fourth Amendment excessive force claim. *See D'Agastino v. City of Warren*, 75 F. App'x 990, 995 (6th Cir. 2003); *Williams v. Collins*, No. 15-cv-337, 2017 WL 1196114, at *7 (S.D. Ohio Mar. 31, 2017). The Court, therefore, will deny summary judgment to Defendants on the battery claim.

## IV. CONCLUSION

For all the foregoing reasons, the Motion of Defendants Blue Ash Police Sergeant Roger Pohlman and Officer Todd Stewart for Summary Judgment (Doc. 76) is hereby **DENIED**.

**IT IS SO ORDERED**.

DATED this 19th day of July 2017.

BY THE COURT:


S/Susan J. Dlott
Susan J. Dlott
United States District Court Judge